Associated Gas & Electric Company and another, Appellants, vs. Public Service Commission, Respondent.

*March 3—June 2, 1936.*

For the appellants there were briefs by *Chapman & Cutler* of Chicago, Illinois, *Rogers & Vance* of Fort Atkinson, and *Olin & Butler* of Madison, and oral argument by *Charles B. Rogers, Byron H. Stebbins* of Madison, and *Sheldon Vance*.

For the respondent there was a brief by the *Attorney General, H. T. Ferguson,* special assistant attorney general, and

*Alvin C. Reis,* chief counsel for the Public Service Commission, and oral argument by *Mr. Reis* and *Mr. Ferguson.*

The following opinion was filed March 31, 1936:

FOWLER, J. The plaintiff Associated Gas & Electric Corporation petitioned the Public Service Commission of Wisconsin for registration of bonds it was issuing. The commission denied the application. The appellants brought action in the circuit court to review the order of the commission. The court confirmed the order.

The appellants contend, (1) that registration of the bonds was not necessary; and (2) that if it was registration should have been granted.

The plaintiff Associated Gas & Electric Company, hereinafter referred to as the "Company," owns all the stock of the plaintiff Associated Gas & Electric Corporation, hereinafter referred to as the "Corporation." The Company had outstanding debentures to the amount of $264,000,000 bearing fixed interest rates and maturing at different times. Its income is practically all derived from the Corporation. The Corporation's income is derived from its subsidiaries. During the period of the general business depression commencing about 1931, the income of the numerous subsidiaries of the Corporation fell off, and thus the income of the Company fell off to a point where the Company claims it became likely that it would default in its debenture obligations and be forced into receivership. To avoid this, the two corporations devised a plan of converting such portion of their interest-bearing debentures into income debentures, rearranging dates of maturity and rates of interest of the new interest-bearing debentures, and procuring exchanges of the old securities for the new, so as to enable the Company to avoid defaults and escape receivership. Some holders of the debentures of the Company were residents of Wisconsin. To enable the Company to negotiate with Wisconsin residents for exchange of

the new securities for the old, the Corporation filed with the Public Service Commission of the state, which will hereinafter be referred to as the "commission," a petition for a "permit to sell" the new bonds. An exchange is a sale within the terms of the statutes governing the granting of permits to sell. Securities are "registered" when a permit to sell them is granted, and the term "registration" is hereinafter used as synonymous with the word "permit" and the phrase "issuance of a permit." The commission denied registration, except as to one of the three classes of the new bonds proposed.

The proposed plan provided for giving the debenture holders the choice of three options: (a) The debenture holders might take in exchange for their debentures new debentures due in 1973 to the amount of fifty per cent of the old bonds surrendered bearing the same rate of interest as the old bonds. The new debentures were not those of the Company, but of the Corporation. The amount of these new bonds to be issued was limited to $50,000,000. The new bonds might be exchanged within ten years from June 15, 1935, to income debentures of the Corporation due in 1978, of the kind covered by option (b) and of the same amount as if originally accepted under option (b). Option (a) was terminable at any time. The bonds were to be subject to $10,000,000 of outstanding bonds of the Corporation. Registration of these bonds was denied, but as the amount to be issued is now fully subscribed by nonresidents of Wisconsin, the question whether registration of them by the Wisconsin commission was necessary is moot.

(b) Debenture holders might take for their old bonds debentures of the Corporation to the amount of the bonds exchanged with interest payable out of earnings after payment of the obligations of the Corporation. The bonds were cumulative in nature. Five and a half and five per cent bonds were reduced in rate one per cent, four and a half reduced to three

and three-quarters per cent, and four per cent reduced to three and a half per cent. These bonds were to be subject to the $10,000,000 of outstanding bonds of the Corporation.

(c) Debenture holders might take sinking-fund income debentures of the Company, due in 1983, of the same amount as the debentures surrendered, with interest at the same rate, cumulative, additional interest to be added under specified conditions which need not be stated, as the commission ruled that registration of these bonds was not necessary on the ground that the exchange would merely be one form of bond of the Company for another form of bond of the same Company of the same denomination.

As the plaintiffs are not prejudiced by the ruling of the commission respecting exchanges of bonds under options (a) and (c), we will limit our consideration of the case to the questions arising respecting option (b), which are above outlined under headings (1) and (2).

(1) Whether any permit was necessary to authorize exchanges under option (b) depends on the terms of the statutes exempting certain classes of bonds from the restrictions respecting the negotiations of securities. The constitutionality or validity of the statutory regulations respecting registration is not attacked. The only question raised is respecting the construction of the statutes relating to exemption from those regulations. The statute which the plaintiffs most strenuously contend exempts the bonds to be transferred under option (b) from the permit regulations is sec. 189.05 (6), which is as follows:

"189.05    *Exempt sales.*    Except as hereinafter provided the provisions of this chapter prohibiting the sale of securities unless registered by the commission shall not apply to the following transactions: . . .

"(6) The sale of securities when made by or on behalf of a vendor not the issuer thereof who, being a *bona fide* owner of such securities, disposes of his own property for his own

account, provided such vendor at the time of such sale is not engaged either wholly or in part in the business of selling securities and such sale is not made, directly or indirectly, for the benefit of any other person or company, or for the purpose of violating or evading any provision of this chapter."

The meaning of the word "sale" in this statute is fixed by sec. 189.02 (6), Stats., as covering "every disposition, offer, negotiation, agreement or attempt to dispose of a security . . . and every exchange of a security for property." The word "vendor" is not defined in the statute, but it is obviously used as referring to a person effecting a "sale," and would thus cover the party negotiating or attempting to negotiate the transfer of securities in exchange for property.

As the matter of registration first came before the commission, and as matters stood when the commission first determined the matter, only the Corporation was before the commission, and the right of the Corporation to registration of bonds issued by itself was the only question involved. The Corporation was, within the language of the statute, a "vendor" proposing to "sell" bonds issued by itself, and was not exempted from the provisions of sec. 189.06 (1), Stats., requiring registration before the bonds could be "sold."

After the commission first denied the Corporation's application, the Corporation asked for a rehearing, which was granted, and it was then first contended that it was the Company that was in fact disposing of the bonds, and it was disposing of them as the owner thereof in good faith within the meaning of sub. (6) above quoted. The theory upon which it claimed to be such owner is that as part of the plan of reorganization the Corporation had declared a dividend of $265,000,000 to the Company, and in payment of the dividend had delivered to the Company the new bonds covered by the options. Said sub. (6) provides that to exempt from registration the vendor must be a *"bona fide* owner" of securities, disposing of "his own property for his own account,"

and that the sale contemplated cannot be made "directly or indirectly, for the benefit of any other person or company, or for the purpose of violating or evading any provision of this chapter." The commission found that the Company was not a *bona fide* holder of the Corporation bonds within the meaning of this statute. This conclusion was correct. The Company, if it had possession of the Corporation's bonds at all, did not hold them as an absolute owner. It could not lawfully sell them to the general public. Its disposition of them was restricted. It could part with them only by exchanging them for its own bonds of like denomination. It could not deliver one of them to a resident of Wisconsin except in exchange for one of its own bonds of like denomination. This was not *bona fide* ownership. Moreover, the exchange was at least indirectly for the benefit of the Corporation, and within the language of sub. (6) was thus indirectly if not directly "for the benefit of any other [another] person or company." The exchange of the bonds was manifestly for the benefit of the Corporation, for without it the Corporation could not pay the dividend it had declared. The Corporation was the one that was disposing of the bonds to the public as a means of paying its dividend. It was to pay its dividend with bonds of the Company and attempting to effect the contemplated exchanges for the purpose of procuring Company bonds with which to pay it. That was the Corporation's own view of the matter, as is evidenced by the fact that it was the Corporation that applied for the "permit to sell" the bonds in the first instance. In the proceedings for registration, up to the time the permit was first denied, no suggestion of Company ownership was made. The belated contention of ownership by the Company involves the concluding condition of sub. (6)—that the vendor shall not be making the sale "for the purpose of violating or evading any provision of this chapter." The contention of Company ownership was presented for the purpose of evading the statutory provisions

requiring registration by the Corporation as prerequisite to disposition of the bonds.

It is also contended that the Company is entitled to exchange the Corporation bonds without registration under the portion of sec. 189.05 (15), Stats., declaring that the provisions of the statutes prohibiting the sale of securities without registration shall not apply to "the issue in good faith of securities by a company to its security holders, or creditors, in the process of a *bona fide* reorganization of the company made in good faith, or the issue in good faith of securities by a company, taking over substantially all the assets and continuing the business of another company, to the security holders or creditors of such other company." But the Corporation does not come within this language because the new bonds are not "issued" to "its security holders," but to the security holders of the Company; and the Company does not come within the language because it is not "a company taking over . . . the assets and continuing the business" of the Corporation. The Corporation continues the business, not the Company. It is suggested that the two corporations are so connected that the one is the other. If so, why the other? But even so, on this hypothesis, the language would not apply because the Company would not be continuing the business of another company, but merely continuing its own.

It is urged that the word "issue" in the statute should be construed to cover the bonds of the Corporation as well as the bonds of the Company. We do not so regard the matter. The statute was not intended to exempt from registration bonds to be issued by companies not in process of reorganization. The value of the bonds offered in exchange depends on the value of the securities back of them. New bonds of a reorganizing company might rightly be presumed to have back of them the same security that the old bonds had, and therefore be of the same value as the old bonds. New bonds of another company offered would presumably have different security back of them. They might therefore be of less value

than the bonds for which they were offered in exchange. The exchange of such bonds therefore ought not to be permitted without examination by the commission as to how they are secured, while the exchange of new bonds of the reorganizing Company for its old bonds might properly be permitted without such examination.

In support of the commission's ruling that registration was necessary, it may be stated further that avoidance of registration of the bonds issued by the Corporation for the purpose of taking up the bonds of the Company cannot be justified merely by entries on the books of the two corporations. The Corporation was issuing new bonds. There can be no question about that. Before those bonds could be sold in Wisconsin, registration of them was necessary under the letter and within the spirit of the law. The naked fact is that the new bonds were new bonds of the Corporation, and according to the law of the state they had to be registered before they could be disposed of in this state. To contend to the contrary is to quibble.

(2) The statute under which the appellants claim the right to registration of the securities is sec. 189.07, Stats. The commission denied the application because in its opinion the provisions of the statute in three particulars were not met. One of these particulars is in respect to unfairness and inequitableness of the plan. The statute provides as to this matter that:

"(1) Upon the filing of an application for registration of securities, the commission shall examine the same and the other papers and documents filed therewith. . . . If . . .

"(b) The plan of financing is not unfair, inequitable, dishonest, or fraudulent. . . .

"(h) The commission . . . shall register such securities; otherwise it shall issue its findings and order denying the application. . . ."

In support of the action of the commission in denying the registration, we need and will only consider the finding of the

commission respecting the unfairness and inequitableness of the plan. There were outstanding bonds of the Company to the amount of $264,000,000 bearing fixed rates of interest and with successive fixed dates of maturity. The plan proposed that, pursuant to acceptance of option (a), fifty million of interest-bearing bonds should be issued, and no more, and the issuance of these might be cut off at any time. The acceptance under option (a) of fifty million of these bonds would cover a hundred million of the bonds of the Company, as those exercising option (a) had to accept new bonds of only one half the face value of the bonds surrendered. This would leave the holders of a hundred and sixty-four million of the Company bonds without the privilege of procuring any of the fifty million fixed interest-bearing bonds. If more than fifty million of these bonds were subscribed for, the fifty million would be allotted according to the whim or favoritism of the officers of the Company, perhaps to officers themselves in preference to others if any officers were among the holders exercising option (a). At any rate, the holders of one hundred sixty-four million of the bonds would have no chance to secure any interest-paying bonds. They were relegated, willy-nilly, to taking one class or the other of the income bonds due in fifty years or so. If perchance no income above interest requirements should be earned, those receiving the income bonds would not only receive no interest, but would be barred from recovering any principal for fifty years, by which time all of them will doubtless be in their graves. This is not treating all bondholders alike. It is not equality, and where equality is lacking so is equity.

By another provision of the plan the surrendered bonds are all to be placed in escrow, and specified persons, as escrow agents, are given the power at their discretion to resurrect the lifeless Company bonds and substitute them for those received in exchange for them by the Company bondholders.

There is no protection against purely arbitrary action of these agents in this respect. Two of the escrow agents are vice-presidents of both the Company and the Corporation. Another is a director of both corporations. The relations of the others to the Company are not disclosed by the record, but the three mentioned are a majority of the agents, and the majority control the acts of the agents. Thus the holders of the new bonds would not know what they had. They would acquire only a "pig in a poke" and would have no means of opening the poke.

While the ostensible purpose of the reorganization was to avoid a receivership, power to force a receivership was merely taken from the hands of the Company bondholders and placed in the hands of the escrow agents who could throw the Company into the hands of a receiver at any time they might arbitrarily choose, perhaps to their own advantage as receivers or otherwise, and to the disadvantage of the bondholders. This suggests a suspicion that the reorganization was in reality conceived in the interest of others than the bondholders. This suspicion is somewhat supported by the fact that while the interest burden of the Company was less than $12,400,000 in 1933, the year next preceding the filing of the application, its net earnings were over $14,800,000, from which it would appear that the imminence of a receivership was more fanciful than real.

The holders of bonds accepted under option (a) could not after ten years exchange these bonds for the income-bearing bonds of the Corporation offered under option (b). In case of failure of the Company and its reorganization or the winding up of its affairs after expiration of that period, fifty millions of the losses of the Company would be borne entirely by the holders of these bonds. Neither the stockholders nor the other bondholders would bear any portion of this loss. And in case the Company should not fail, fifty millions of the

Company's debts would be discharged, wholly at the loss of the holders who accepted option (a) and to the benefit of those who accepted the other options and of the Company.

All this is enough in our opinion to warrant the view of the commission that it could not find that the "plan of financing was not unfair and inequitable" and to justify its refusal to register the securities.

The appellants claim that the commission did not make findings as required by the statute. They claim that to justify denial of registration the commission must affirmatively find that the plan of reorganization is either "unlawful, dishonest, fraudulent or otherwise contrary to public policy," or "is unfair, inequitable, dishonest or fraudulent." If such an affirmative finding is necessary, we are of opinion that the commission's decision contains an affirmative finding that is sufficient to support its determination. All the commission was required to find in denying registration in order to satisfy the calls of sec. 189.07, Stats., is that the Company's plan of financing is unfair and inequitable. As has been above stated, the commission filed two decisions. The second was in effect but an affirmance of the first. In the body of the first decision filed it is stated:

"We are of opinion that . . . [certain matters referred to] establish that the Company's plan of financing is unfair and inequitable."

This is a finding of fact, and it constitutes adequate support for the order denying the application before the commission.

*By the Court.*—The judgment of the circuit court is affirmed.

A motion for a rehearing was denied, with $25 costs, on June 2, 1936.